UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FTE NETWORKS, INC.,<br><br>                        Plaintiff,<br><br>   v.<br><br>CERBERUS FINANCE GROUP, LTD, ALBERTO DAYAN, SINAN TEZCAN, LG CAPITAL FUNDING, LLC, JOSEPH LERMAN, DANIEL GELLMAN, QUARUM HOLDINGS, LLC, DENNIS RINGER, ROBERT HUGHES, AND THE JOHN DOE AND JANE DOE INVESTORS<br><br>                        Defendants. | Civ. A. No.: |

## **COMPLAINT**

Plaintiff FTE Networks, Inc. ("FTE"), by and through its undersigned counsel, files this Complaint against Cerberus Finance Group, Ltd. ("Cerberus"), Alberto Dayan, Sinan Tezcan (together with Alberto Dayan, collectively, the "Cerberus Principals"), Capital Funding, LLC ("Capital Funding"), Joseph Lerman, Daniel Gellman (together with Joseph Lerman, collectively, the "Capital Funding Principals"), Quarum Holdings, LLC ("Quarum" and together with Cerberus and Capital Funding, collectively, the "Companies"), Dennis Ringer, Robert Hughes (together with Dennis Ringer, collectively, the "Quarum Principals" and together with the Cerberus Principals and the Capital Funding Principals, collectively, the "Principals") and the John and Jane Doe Investors of the Companies (the "Investors" and together with the Companies and the Principals, collectively, the "Defendants" or the "Enterprises"), and, upon information and belief, alleges as follows:

**NATURE OF THE ACTION**

1. This is an action alleging fraud and conspiracy by three lender companies, controlled and manipulated by the Principals and Investors, to carry out a long-running scheme to collect upon unlawful debts and otherwise fraudulently obtain thousands of dollars in funds from FTE in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The Defendants entered into fourteen so-called "4% Convertible Redeemable Notes" with FTE (the "Notes"). Although the title of the Notes reference a 4% interest rate, the purported form of the transaction was merely a sham to evade applicable usury laws. The Notes permitted the Defendants to convert any or all of the outstanding balance of the loan into shares of FTE stock at a conversion price set at 65% of the stock's lowest trading price for the twenty prior trading days. The Notes also contained significant hidden fees and prepayment penalties. In reality, the Notes were loans that charged interest rates that exceeded not less than 60%, rates that are far greater than the maximum 25% permitted under the laws of New York.

2. Notes with "floating-price convertible options" recently came under scrutiny by New York's highest court in a matter involving a convertible note almost identical to the Notes issued to FTE here.

3. In *Adar Bays, LLC v. GeneSYS ID, Inc.,* 37 N.Y.3d 320, 324, 179 N.E.3d 612 (2021), the Court of Appeals acknowledged the long history of lenders attempting to avoid the enforcement of usury laws by disguising the loan in various alternative forms. *Id*. at 338. Specifically, with regard to convertible notes, the Court of Appeals indicated that "[i]f misused, the floating-price convertible option may constitute another form of usury cloaked in novel form." *Id*.

4. In considering whether convertible notes violate New York's usury laws, the Court of Appeals held that "the usury laws are implicated when a lender stipulates for a contingent benefit that, if exercised or triggered, has the potential to cause interest to accrue in amounts greater than the legal limit." *Id*. The Court of Appeals specifically held that "the contingent nature of the option's exercise [does not] remove the loan from the scrutiny of the usury law," and as a result, courts must "assess the overall value of the conversion option at the time of the bargain." *Id*. at 338.

5. The Court of Appeals also affirmed that "loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument." *Id*. at 333.

6. As a result of the Court of Appeals' decision, the Second Circuit remanded the case for the district court to determine whether the note is usurious and, if the district court so determines, find the convertible note void *ab initio*. *Adar Bays, LLC v. GeneSYS ID, Inc.,* No. 18-3023, 2022 U.S. App. LEXIS 6591, at *1 (2d Cir. Mar. 15, 2022).

7. In this instance, the Defendants took advantage by effectively robbing FTE's shareholders and its creditors of millions of dollars—in a period of just months. Notably, at the time of these transactions, FTE, then publicly traded company, was being victimized by a CEO and CFO who were later indicted for fraud and embezzlement.

8. As a resolute of the stock conversion options, hidden fees, prepayment penalties, and other one-sided provisions in the Notes, the Defendants were able to disguise the usurious interest rates of the Notes, at rates of at least 65% annual interest.

9. It is against this backdrop that Plaintiff files this Complaint.

**THE PARTIES**

10. FTE Networks was a corporation duly organized under the laws of Nevada with its principal place of business located in Naples, Florida.

11. Cerberus Finance Group, Ltd. is a corporation organized under the laws of Nevada with its principal place of business in Nevada.

12. Alberto Dayan is a principal owner, manager and member of Cerberus, and a citizen and resident of Nevada.

13. Sinan Tezcan is a principal owner, president and member of Cerberus, and a citizen and resident of the United Kingdom.

14. LG Capital Funding, LLC is a corporation organized under the laws of New York with its principal place of business in New York.

15. Joseph Lerman is a principal owner, manger and member of LG Capital, and a citizen and resident of New York.

16. Daniel Gellman is a principal owner and member of LG Capital, and a citizen and resident of New York.

17. Quarum Holdings, LLC is a corporation organized under the laws of Delaware with its principal place of business in New York.

18. Dennis Ringer is a principal owner, manager and member of Quaram, and a citizen and resident of Nevada

19. Robert Hughes is a principal owner and member of Quaram, and a citizen and resident of Nevada.

**JURISDICTION**

20. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiff's claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

22. Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

**FACTUAL ALLEGATIONS**

**A.     General Background of FTE**

23. At all times material hereto, FTE Networks, together with its wholly owned subsidiaries provided innovative, technology-oriented solutions for smart platforms, network infrastructures and buildings. The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies.

24. In 2017, FTE needed additional financing. To procure that financing, FTE turned lenders offering convertible notes and, in doing so, fell victim to the tactics described above.

**B.     The Cerberus Notes**

25. Over an eight-month period between April 30, 2018 and January 13, 2019, FTE entered into five transactions with Cerberus and the Cerberus Principals.

26.     The first note was dated April 30, 2018. The second note was dated June 26, 2018. The third note was dated November 11, 2018. The fourth note was dated December 3, 2018. The fifth note was dated January 13, 2019. These five notes (collectively, the "Cerberus Notes") are attached hereto as **Exhibits A**, **B**, **C**, **D**, and **E** respectively and are incorporated herein as if set forth at length.

27.     All of the Cerberus Notes are governed by and construed in accordance with the laws of the state of New York.

**C.     The LG Capital Notes**

28.     Over an eight-month period between April 27, 2018 and January 3, 2019, FTE entered into three transactions with LG Capital and the LG Capital Principals.

29.     The first note was dated April 30, 2018. The second note was dated June 14, 2018. The third note was dated November 5, 2018. The fourth note was dated December 3, 2018. The fifth note was dated January 3, 2019. These five notes (collectively, the "LG Capital Notes") are attached hereto as **Exhibits F**, **G**, **H**, **I**, and **J** respectively and are incorporated herein as if set forth at length.

30.     All of the LG Capital Notes are governed by and construed in accordance with the laws of the state of New York.

**D.     The Quarum Notes**

31.     Over an eight-month period between April 27, 2018 and January 7, 2019, FTE entered into four transactions with Quarum and the Quarum Principals.

32.     The first note was dated April 30, 2018. The second note was dated June 18, 2018. The third note was dated November 5, 2018. The fourth note was dated January 7, 2019.

These four notes (collectively, the "Quarum Notes") are attached hereto as **Exhibits K**, **L**, **M**, and **N** respectively and are incorporated herein as if set forth at length.

33.     All of the Quarum Notes are governed by and construed in accordance with the laws of the state of New York.

**E.     The Notes are Consistent with Predatory Practices by Other Lenders**

34.     Like many predatory lender companies, the Defendants prey upon cash-strapped businesses that cannot readily obtain financing from banks and other traditional lenders. Although the Notes are titled "4% Convertible Redeemable Notes," the purported form of the transaction was merely a sham to evade applicable usury laws. The Defendants underwrite, market and collect upon their transactions as loans, with effective interest rates far above those permissible under New York law.

35.     Moreover, the Defendants did not even advance the full amount of the Notes as they were reduced by the Defendants for certain fees. These fees include underwriting and origination fees, wire fees and processing fees. Despite the title of these fees, the Defendants performed little, or no due diligence and the actual costs of the processing costs were a fraction of the fees. Indeed, in reality, these fees were merely additional disguised interest.

**F.     The Notes are Substantively and Procedurally Unconscionable**

36.     The Cerberus Notes, the LG Capital Notes and the Quarum Notes (collectively, the "Notes") are unconscionable contracts of adhesion that were not negotiated at arms-length.

37. Instead, they contain one-sided terms, such as the convertible stock option, that prey upon the desperation of the business and their individual owners and help conceal the fact that the transactions, including those involving FTE, are really loans.

38. The Notes are also unconscionable because they contain numerous knowingly false statements, are designed to fail, and contain numerous improper fees and penalties that violate New York's strong public policy of prohibiting usurious loans.

### G. The Intent of the Defendants' Enterprise is to Issue Loans Using a Convertible Option to Disguise the Loans

39. In order to evade state usury laws, the Defendants include a floating price convertible option that permit the Defendants to convert any or all of the outstanding balance of the loan into shares of FTE stock at a conversion price set at 65% of the stock's lowest trading price for the twenty prior trading days.

40. Despite their documented form, the transactions are, in economic reality, loans that are absolutely repayable.

41. New York law looks primarily to the intent of the parties in determining whether a transaction is a loan. Here, usurious intent can be discerned from internal negotiations, practices, and underwriting practices of the Defendants. The Defendants had the sole option to convert the loan into stock at a fixed discount. As a result, Defendants will always be able to receive more on each dollar it converts into stock because the discount has been reserved explicitly in the Note at the time the loan was entered into.

42. The value of the shares reserved to Defendants at the time of the Loans is interest under NY law and clearly violates the New York's Criminal Usury Laws.

## FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

43. Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

44. More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

45. In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

46. As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

47. As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

48. This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

49. The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

50. Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

51. Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

52. The Principals and the Investors are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

53. At all relevant times, each of the Principals and the Investors was, and is, a person that exists separate and distinct from the Enterprises.

54. Principals have an ownership interest in the Companies and are the mastermind of the Enterprises.

55. The Investors are individuals and business entities that provide funding for the criminally usurious and unenforceable loans made by the Enterprises.

56. Through their operation of the Companies, each Enterprise solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

57. The respective Principals, the Companies, and the Investors each constitute an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

58. The Principals, the Companies, and the Investors are associated in fact and through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, each Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

59. Beginning since 2018 and continuing through the present, the members of the Enterprises have had ongoing relations with each other through common control/ownership,

shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

60. The debt, including such debt evidenced by the Notes, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.  Under New York law, agreements that are usurious are void and unenforceable.

61. The Notes (attached and incorporated as **Exhibits A – N**) have minimum effective annual rates of 61% to 120%, as evidenced by the attached summary, attached hereto as **Exhibit O** and incorporated herein as if set forth at length.

62. Since at least 2018 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

63. The Enterprises' conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of each Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

64. The Principals, the Companies, and the Investors have organized themselves and the Enterprises into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

65.     The Principals are the owners and masterminds of each Enterprise. They responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of the Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

66.     In the Principals' capacity as the masterminds of each Enterprise, the Principals are responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt.

67.     The Principals have also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

68.     The Principals have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the Companies and to the Investors and the Principals further benefit from the receipt of distributions and payment of salary or commissions by the Companies.

69.     The Principals and the Investors have operated the Companies as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, the Companies has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors

to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called convertible notes on behalf of the Enterprise; (v) serviced the usurious loans; and (vi) obtained judgments in its name to further collect upon the unlawful debt.

70. The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of the Companies and the Principals.

71. Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing the Companies with all or a portion of the pooled funds necessary to knowingly fund the usurious loans, including the Notes, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

72. The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

73. The Enterprises are engaged in interstate commerce and use instrumentalities of interstate commerce in their daily business activities.

74. Specifically, members of the Enterprise use personnel in their office to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

75. FTE has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

76. The injuries to FTE directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include but are not limited to improperly collected criminally usurious loan payments.

77. Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

78. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

79. Plaintiff repeats and re-alleges the allegations of each of the foregoing paragraphs.

80. Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

81. By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of each Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

82. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

83. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

84. The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

85. Plaintiff has been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

86. The injuries to the Plaintiff directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

87. Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

88. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from the Defendants.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in their favor against Defendants, jointly and severally, and seek a judgment:

a) Declaring each of Plaintiff's agreements with Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b) Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at a hearing;

c) Awarding treble damages;

d) Requiring Defendants to pay Plaintiff's attorneys' fees and costs; and

e) Any further relief deemed appropriate by the Court.

Dated:  April 29, 2022

**WHITE AND WILLIAMS LLP**

By: _____
Shane R. Heskin
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs*